## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

IRA ALSTON,                                  :
                                             :
    Plaintiff,                           :            CIVIL ACTION NO.
                                             :            3:09-cv-01978 (VAB)
v.                                           :
                                             :
MICHAEL PAFUMI, ET AL.,                      :            JANUARY 7, 2016
                                             :
    Defendants.                          :


### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


## I.     INTRODUCTION

Plaintiff, Ira Alston, is a convicted prisoner in the custody of the Connecticut Department of Correction ("DOC") at Northern Correctional Institution ("Northern").  Mr. Alston filed this action *pro se* under 42 U.S.C. § 1983 against twenty-four DOC employees.  The Court appointed counsel to represent Mr. Alston.  Defendants move for summary judgment as to all claims.  For the following reasons, the motion is GRANTED IN PART AND DENIED IN PART.

## II.     FACTS[1]

Mr. Alston is serving a thirty-six year sentence for manslaughter in the first degree.  He is incarcerated at Northern, which is a maximum security facility designed to house inmates who have demonstrated a serious inability to adjust to confinement, and who pose a threat to the safety and security of the community, staff, and other inmates.  Mr. Alston's Inmate Overview Sheet dated November 2009 classifies him as "Assaultive" and a "BLOODS THREAT" and

---

[1] The facts set forth herein are undisputed unless otherwise indicated.  Statements in affidavits that are not contradicted by record evidence or the affiant's prior testimony are undisputed for purposes of this ruling.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion"); *e.g.*, *Ebert v. Holiday Inn*, No. 11 Civ. 4102 (ER), 2014 WL 349640, at *2 (S.D.N.Y. Jan. 31, 2014) ("[T]o the extent that the statements in the . . . Affidavits are not disputed . . . or contradicted by other evidence in the record or by the individuals' own deposition testimony, the Court will consider them in resolving" summary judgment motion).

gives him a score of "4" for "Security Risk Group."  Defs.' Ex. 1.  As of November 2009, Mr.

Alston had received over 120 disciplinary tickets, including 50 for interfering with safety and

security, 15 for disobeying direct orders, 13 for threats, 4 for assaulting DOC staff, 5 for fighting,

4 for flagrant disobedience, and the remainder for various other offenses.  *See* Defs.' Ex. 41.

### A.    Complaints

Mr. Alston attests that he filed a claim on October 18, 2009 reporting two missing boxes

of legal mail and one missing box of personal effects.  He attests that, when he later confronted

Lt. Pafumi about this issue, Lt. Pafumi became verbally abusive.  Mr. Alston then filed a

complaint against Lt. Pafumi for the alleged verbal abuse.  Lt. Pafumi attests that he has no

recollection of Mr. Alston's property boxes, or the alleged interaction.

Mr. Alston attests that, on November 6, 2009, Lt. Pafumi instructed an officer to issue

Mr. Alston a disciplinary ticket.  When Mr. Alston asked why, Lt. Pafumi allegedly responded,

"You'll see," and allegedly threatened that he and other officers were "going to make [Mr.

Alston's] life a living hell."  Mr. Alston was issued a ticket later that day for using inappropriate

language in an inmate request form.

After receiving that ticket, Mr. Alston allegedly filed a complaint requesting an

investigation into alleged misuse of the disciplinary process by Lt. Pafumi as a means for

retaliation and harassment.  Mr. Alston attests that, on November 14, 2009, Lt. Pafumi said to

him, "we have something real special for you Mr. Alston."

### B.    Incidents of November 23-26

On November 23, 2009, Mr. Alston called the housing unit control pod and asked for

ibuprofen to relieve his alleged headache.  Correctional Officer ("CO") Sledzianowski answered,

refused to summon the nurse, and then hung up.  Mr. Alston called again and asked CO

Bowerman for ibuprofen.  CO Bowerman did not give Mr. Alston ibuprofen.  Nurse Dudley was administering a medication line at or around the same time, and she also refused to give Mr. Alston ibuprofen, claiming that he needed to submit a sick call request to receive such medication and that sick call requests were not handled during medical line administration.

Mr. Alston then covered his cell door window.[2]  Inmates are not allowed to cover their cell door windows because this prevents DOC staff from being able to tell if inmates are harming themselves or engaging in destructive or prohibited behavior.  Facility operating procedures provide that "[a]n inmate is not permitted to . . . hang drapery over the front of the cell door or window, or obstruct an open view into the cell or the back window of the cell."  Defs.' Ex. 8, Attachment D.

COs at Northern are trained to call a lieutenant when they encounter a non-compliant inmate.  Thus, when Mr. Alston covered his cell window, a CO placed a call and Lt. Pafumi responded.  After Lt. Pafumi arrived outside of Mr. Alston's cell door, he directed CO Wiseman to record his interaction with Mr. Alston with a handheld video camera.  The video shows Lt. Pafumi instructing Mr. Alston to uncover his cell door window.  Mr. Alston removed the obstruction.

After Mr. Alston uncovered his window, Lt. Pafumi instructed Mr. Alston to put his hands through the trap on the cell door so that he could be handcuffed and removed from the cell, a process referred to as "cuffing up."  Mr. Alston was repeatedly non-compliant with Lt. Pafumi's orders to "cuff up."

Someone from the mental health unit told Mr. Alston that if he continued to refuse orders to "cuff up," then a chemical agent might be deployed to gain his compliance.  Mr. Alston eventually complied and put his hands through the trap.  He was handcuffed, removed from his

---

[2] Mr. Alston alleges that CO Bowerman told him to cover his cell window.  CO Bowerman denies this.

cell, and escorted to another cell.  Upon his arrival in the new cell, Mr. Alston was strip-searched, provided clean clothes, and placed on in-cell restraints.  DOC rules provide that inmates placed on in-cell restraints are to have their hands handcuffed in front of them, leg irons secured to their ankles, and a tether chain attaching the leg irons to the handcuffs with a length of chain that allows the inmate to stand erect.  Admin. Directive 6.5 ¶ 8.B.3.

While staff attempted to put Mr. Alston on in-cell restraints, Mr. Alston refused to obey orders to lift his legs to allow DOC staff to change his pants and underwear.  Mr. Alston then went limp and allowed his legs to hang as dead weight while DOC attempted to change his pants and underwear, and he continued to refuse orders to lift his legs.  After the in-cell restraints were in place, Nurse Dudley checked the spacing on Mr. Alston's restraints and confirmed that she could place multiple fingers between Mr. Alston's skin and the restraints.  Mr. Alston complained that he was "short-chained," *i.e.*, that the tether chain attaching his leg irons to his handcuffs was too short.  The video footage shows that Mr. Alston was able to stand fully erect after the in-cell restraints were applied.

After Lt. Pafumi and other staff left the cell, Mr. Alston complained that the cell smelled like feces.  Lt. Pafumi attests that the cell did not smell like feces.  The video shows no feces smeared about the cell.  Mr. Alston attests that the toilet was filled with feces and that he could not flush the toilet because the flush mechanism was controlled by COs outside of the cell.

After Mr. Alston was placed on in-cell restraints, CO Marquiss issued him a disciplinary report for the offense of "Interfering with Safety and Security."  Defs.' Ex. 5.

While Mr. Alston was on in-cell restraint status, he was placed on 15 minute watch.  Staff maintained a restraint checklist to document their observations of Mr. Alston's behavior every 15 minutes.  The checklist indicates that, for some stretches of time, Mr. Alston was yelling,

4

cursing, beating on the door or wall, and/or standing on the sink, and that, for other stretches of time, he was lying down, sitting, eating a meal, and/or undergoing an inspection. *See generally* Defs.' Ex. 17.  On November 24 and 25, Lt. Pafumi prepared incident reports in which he indicated that Mr. Alston's in-cell restraint status would continue based on the disruptive behavior documented on the checklist.  Defs.' Ex. 16 at 5, 6.

### C.    Alleged Conduct of Lieutenant Saylor

#### 1.    Alleged Visit

Mr. Alston attests that, at approximately 11:00 a.m. on November 26, Lt. Saylor allegedly entered Mr. Alston's cell, allegedly slapped Mr. Alston across the face repeatedly with the front and back of his hand while Mr. Alston lay in bed in restraints, allegedly grabbed Mr. Alston by the neck and shoved his head and face into the wall, allegedly yelled obscenities at Mr. Alston, and allegedly choked Mr. Alston until near unconsciousness while allegedly threatening to kill Mr. Alston if he told anyone about this incident.  Lt. Saylor denies all of this.

#### 2.    Unsuccessful Attempt to Remove In-Cell Restraints

At approximately 12:20 p.m. on November 26, Lt. Saylor went to Mr. Alston's cell to evaluate his in-cell restraint status because Mr. Alston was approaching the 72-hour limit for such status.  Lt. Saylor noted that the restraint checklist indicated that Mr. Alston had not engaged in disruptive behavior since 9:00 a.m. that day.  Lt. Saylor directed CO Wiseman to use a handheld video camera to record the removal of Mr. Alston from in-cell restraint status.

Lt. Saylor entered Mr. Alston's cell and told Mr. Alston that he was being taken off of in-cell restraint status.  Mr. Alston repeatedly refused to respond to Lt. Saylor.  When Lt. Saylor asked him why, Mr. Alston replied that he had asked to get off of in-cell restraint status three days prior, and then demanded to speak with the Commissioner of the DOC to get DOC staff to

"stop abusing me."  Lt. Saylor told Mr. Alston that his failure to obey his orders would result in

his being placed on custody stationary restraints.  Mr. Alston continued to passively resist,

demanding to speak with the Commissioner of the DOC.  Mr. Alston also complained that his

lotion and soap had been taken from him.  DOC rules do not allow items like lotion and soap in

an inmate's cell while on in-cell restraint status.  Lt. Saylor retrieved some additional materials

from Mr. Alston's cell that he was not allowed to have in his possession at that time, including

legal pads and envelopes.

Lt. Saylor then instructed Mr. Alston to sit up so that the in-cell restraints could be

removed.  Mr. Alston remained non-compliant and non-responsive.  Lt. Saylor did not remove

Mr. Alston's restraints and left the cell to give Mr. Alston more time to think about his actions.

At no point during this visit did Mr. Alston complain or allege that Lt. Saylor physically

abused him an hour and one half earlier, or complain of, or request medical attention for, any

pain or injury resulting from the alleged assault by Lt. Saylor an hour and one half earlier.

### 3.      Successful Attempt to Remove In-Cell Restraints

At approximately 1:00 p.m. on November 26, Lt. Saylor returned to Mr. Alston's cell to

remove Mr. Alston from in-cell restraint status.  CO Wiseman recorded this visit with a handheld

video camera.

Staff first attempted verbal intervention, but Mr. Alston remained non-compliant.  Lt.

Saylor then instructed staff to secure Mr. Alston's limbs and to remove his restraints.  Lt. Saylor

instructed Mr. Alston to comply with his directions and the removal of the restraints, but Mr.

Alston continued to lie down on the bunk and not move.  Despite numerous attempts to gain his

compliance, Mr. Alston would not sit up to have his restraints removed.  COs had to remove his

restraints while he was lying down, which placed them at a risk of harm.  Lt. Saylor then asked

that a riot shield be brought to the cell, and COs used the riot shield as cover while they backed out of the cell.

After the restraints were removed, Nurse Scruggs evaluated Mr. Alston for injuries and found none.  Mr. Alston complained that he felt numb, and Nurse Scruggs checked his pulses and capillary refill and determined that he had good circulation.

During this visit, Mr. Alston did not complain or allege that Lt. Saylor physically abused him earlier.  He did not complain of, or request medical attention for, any pain or injury resulting from the alleged earlier assault by Lt. Saylor.

### D. Preservation of Video Footage

On November 26, 2009, the same day that Mr. Alston was taken off of in-cell restraint status, he filed an inmate request form "requesting that all reasonable measures be taken to preserve . . . security nice vision footage"[3] of the cell in which he was confined while on in-cell restraint status.  He also requested preservation of any handheld camera footage of his placement on, and removal from, in-cell restraints.  Defendant Deputy Warden Faucher responded on December 3, writing, "Handheld video footage is stored as evidence.  NiceVision footage is downloaded and stored as deemed necessary by the facility."  Alston Aff., Ex. A.

During discovery, Mr. Alston propounded requests for production of relevant nice vision footage, and Defendants declined to produce such footage, objecting that his requests implicated significant safety and security risks.  Pl.'s Ex. 9.

No nice vision security footage has been provided to Mr. Alston or submitted to the Court.  Despite Mr. Alston's briefing of this issue, Defendants provided no response.

---

[3] The parties do not explain what "nice vision" is.  The Court will assume that it is surveillance footage taken by a camera or cameras other than the handheld video camera at issue.

### III.    STANDARD OF REVIEW

The Court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has carried that initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  A fact is "material" if it might affect the outcome of the case under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).

The Court may rely on video evidence when ruling on a motion for summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### IV.    DISCUSSION

#### A.    Claims

Defendants moved for summary judgment as to all claims.  Plaintiff's memorandum in opposition addressed only the following three claims: (1) excessive force in violation of the Eighth Amendment by Lt. Saylor based on the alleged assault on November 26, 2009, *see* Pl.'s

Mem. Opp. at 15-20; (2) retaliation in violation of the First Amendment based on Defendants'

placing Mr. Alston on in-cell restraint status and keeping him on such status for 72 hours, *id.* at

20-22; and (3) unconstitutional conditions of confinement based on the conditions of the cell to

which Mr. Alston was confined while on in-cell restraint status, *id.* at 22-24.  All other claims are

dismissed as abandoned.  *E.g.*, *Nansaram v. City of New York*, No. 12-CV-5038 (NGG) (RLM),

2015 WL 5518270, at *8 (E.D.N.Y. Sept. 17, 2015) (dismissing claims that plaintiff did not

address in his brief in opposition to defendants' motion for summary judgment); *Brandon v. City

of New York*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (collecting cases and deeming

abandoned claims that plaintiff did not address in his opposition to motion for judgment on the

pleadings); *Bellegar de Dussau v. Blockbuster, Inc.*, No. 03 Civ. 6614 (WHP), 2006 WL

465374, at *7 (S.D.N.Y. Feb. 28, 2006) (granting summary judgment on claim that plaintiff

failed to address in opposition to defendant's motion for summary judgment).

**B.      Excessive Force**

Mr. Alston claims that Lt. Saylor used excessive force in violation of the Eighth

Amendment.  He attests that Lt. Saylor slapped him across the face repeatedly with the front and

back of his hand while he lay in bed in restraints, grabbed him by the neck and shoved his head

and face into the wall, yelled obscenities at him, and choked him until near unconsciousness

while threatening to kill him if he told anyone about this incident.  Lt. Saylor attests that none of

this happened.  Crediting Mr. Alston's version, as the Court must at this stage, a reasonable jury

could find that Lt. Saylor's conduct amounted to a violation of the Eighth Amendment.  *See

Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (discussing excessive force under the Eighth

Amendment and noting that "[w]hen prison officials maliciously and sadistically use force to

cause harm, contemporary standards of decency always are violated").

Defendants argue that the video footage demonstrates the falsity of Mr. Alston's allegations because (1) the footage depicts only two encounters, not the alleged encounter, (2) Lt. Saylor is calm and professional throughout the two recorded encounters, and (3) during the two recorded encounters, Mr. Alston makes only generalized complaints about "abuse" from his being placed on in-cell restraint status, and does not complain about the alleged earlier assault by Lt. Saylor.  Defs.' Mem. at 22-23.[4]

The Court does find it suspicious that Mr. Alston did not complain of Lt. Saylor's alleged assault during either of Lt. Saylor's two allegedly subsequent visits.  It is also suspicious that Mr. Alston showed no signs of injury from Lt. Saylor's alleged assault.  But the Supreme Court has "rejected the notion that significant injury is a threshold requirement for stating an excessive force claim" and noted that the "core judicial inquiry" is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").  Finally, it is suspicious that two neighboring inmates attested that they did not

---

[4] Defendants also argue that Mr. Alston's affidavit testimony regarding Lt. Saylor's alleged assault allegations is contradicted by his original and amended complaints, which allege only two encounters with Lt. Saylor on November 26, 2009.  Defs.' Mem. at 21-22 (citing Compl. ¶¶ 112-23, Amend. Compl. ¶¶ 174, 177).  First, the Court has reviewed the cited paragraphs of Mr. Alston's original and amended complaints and, adhering to its obligation to construe liberally *pro se* pleadings, does not read those paragraphs to identify two encounters with Lt. Saylor to the exclusion of others.  Second, Mr. Alston has consistently alleged that Lt. Saylor assaulted him at approximately 11:00 a.m., and removed him from in-cell restraint status at approximately 1:30 p.m.  Compl. ¶¶ 122-23; Amend. Compl. ¶¶ 174, 179.  Those allegations are consistent with his affidavit testimony, Alston Aff. ¶¶ 53, and the video evidence, Defs.' Ex. 28.  Third, even if Mr. Alston's allegations contradicted his testimony, the Court might be constrained, particularly in light of its obligations to construe liberally *pro se* pleadings and to draw all reasonable inferences in Mr. Alston's favor, to accept Mr. Alston's affidavit testimony over his unsworn allegations.  *See AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 316 (S.D.N.Y. 2005) ("Faced with deposition testimony that contradicts an affidavit and a complaint, this court must accept [plaintiff's] sworn testimony"); *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 279 (S.D.N.Y. 2002) ("Faced with [a] confounding contradiction [between plaintiff's allegations in her complaint and her sworn testimony], the Court has no basis for accepting as true the vague statements in [the] complaint as opposed to [plaintiff's] sworn testimony . . . .").

hear Mr. Alston being disruptive while on in-cell restraint status, and one even attested that he overheard conversations between Mr. Alston and DOC staff, but neither testified that he overheard Lt. Saylor allegedly beating Mr. Alston and yelling obscenities and threats.

These suspicious go to the credibility of witnesses, however, and the Court may not weigh the evidence at this stage. If there were video evidence of the cell during the relevant period clearly showing that these events did not occur, the Court could enter summary judgment. *See Scott*, 550 U.S. at 380. Instead, there is an absence of such video evidence, and Mr. Alston has sworn under oath that Lt. Saylor assaulted him. The Court concludes that Mr. Alston has raised a genuine dispute of material fact, and summary judgment must be denied as to this claim. *See Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009) (noting, "our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak" and collecting cases); *Cicio v. Lamora*, No. 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *7-8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment as to excessive force claim where prisoner plaintiff "testified under oath at his deposition, and stated in a sworn affidavit that defendant . . . punched him unnecessarily in the head several times during [a] cell extraction[,]" there was a "lack of a videotape recording of the relevant events, despite orders to [a] Corrections Officer . . . to follow the established protocol and record the cell extraction," and the defendant "in a sworn affidavit filed with the court, denie[d] punching or striking [plaintiff]," reasoning that "the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact") (citing *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999)), *report and recommendation adopted*, No. 9:08-CV-431 (GLS/DEP), 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010).

11

### C.    Retaliation

Mr. Alston claims that Defendants violated the First Amendment by retaliating against him for filing complaints by placing him on in-cell restraint status, and keeping him on such status for 72 hours.

"Courts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks and citations omitted).

A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected; (2) the defendant took an adverse action against him; and (3) there was a causal connection between the adverse action and the protected speech. *Id.* A plaintiff must also establish that the "defendants were aware of the protected activity." *Pavone v. Puglisi*, 353 F. App'x 622, 625 (2d Cir. 2009).

### 1.    Protected Activity

Mr. Alston attested that he filed (1) a complaint against Lt. Pafumi on or about November 2, 2009 for allegedly yelling and cursing at him, and (2) a complaint with Warden Quiros requesting an investigation into Lt. Pafumi's alleged misuse of the disciplinary process as a means of retaliation, harassment, and intimidation.  Defendants admit that these complaints constituted protected activity.  Defs.' Mem. at 7.  Mr. Alston has raised a genuine dispute as to whether he engaged in protected activity.  *See Davis*, 320 F.3d at 352–53 ("[T]he filing of prison grievances is a constitutionally protected activity"); *McKethan v. New York State Dep't of Corr. Servs.*, No. 10 Civ. 3826 (NRB), 2011 WL 4357375, at *6 (S.D.N.Y. Sept. 16, 2011) ("There can

be little doubt that [prisoner] plaintiff's informal complaints and formal grievances constitute protected activity under the First Amendment.") (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)).

### 2.    Awareness of Protected Activity

As to Defendants' awareness of his protected activity, Mr. Alston has raised a genuine dispute only as to Lt. Pafumi and Warden Quiros.  Mr. Alston attests that both of his complaints concerned Lt. Pafumi's conduct, and one was submitted to Warden Quiros.  Mr. Alston's filings point the Court to no record evidence from which a reasonable jury could infer that any other defendant was aware of Mr. Alston's complaints, and the Court's independent review of the record uncovered no such evidence.  Therefore, the retaliation claims against all defendants other than Lt. Pafumi and Warden Quiros are dismissed.  *See, e.g.*, *Allah v. Michael*, 506 F. App'x 49, 52 (2d Cir. 2012) (affirming summary judgment as to First Amendment retaliation claim where defendant was not aware of prisoner plaintiff's complaint); *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 350 (S.D.N.Y. 2009) (granting summary judgment as to retaliation claim where plaintiff did not come forward with evidence that defendant knew about her protected activity); *Braham v. Lantz*, No. 3:08-cv-01564 (DFM), 2010 WL 1240985, at *5 (D. Conn. Mar. 23, 2010) (dismissing First Amendment retaliation claim where prisoner did not adequately allege that defendant was aware of his grievance); *Taylor v. New York Dep't of Corr. Servs.*, No. 9:10-cv-140 (MAD/RFT), 2012 WL 913678, at *7 (N.D.N.Y. Feb. 23, 2012) ("Because Plaintiff cannot establish that Defendants Harvey or Russell even had knowledge of the protected activity . . . Plaintiff fails to establish a valid retaliation claim."), *report and recommendation adopted*, No. 9:10-cv-140 (MAD/RFT), 2012 WL 913564 (N.D.N.Y. Mar. 16, 2012).

### 3.   Adverse Action

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Goord*, 320 F.3d at 353.  In making this determination, the court's inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "[p]risoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

This Court held, in another case brought by Mr. Alston, that "place[ment] on in-cell restraint status for a period of three days . . . is a classic example of adverse action." *Alston v. Bellerose*, No. 3:12-cv-00147 (CSH), 2015 WL 4487973, at *7 (D. Conn. July 23, 2015) (citing *Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004)).  The Court concludes that Mr. Alston has raised a genuine dispute as to whether his placement on in-cell restraints was an adverse action.

Moreover, DOC rules require that, every 24 hours, a unit administrator must review an inmate's in-cell restraint status.  Admin. Directive 6.5 at ¶ 8.B.6.  Mr. Alston has raised a genuine dispute that Lt. Pafumi's decisions to keep him on in-cell restraint status on November 24 and 25 constituted adverse actions.  *See Alston*, 2015 WL 4487973, at *7.

### 4.   Personal Involvement

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  The retaliation claim against Warden Quiros must be dismissed because Mr. Alston has failed to raise a genuine dispute that Warden Quiros was personally involved in the alleged constitutional deprivation.  *See id.*

Supervisory officials, like Warden Quiros, cannot be held liable under § 1983 solely for the acts of their subordinates.  *See Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).  A plaintiff may show personal involvement of a supervisory official through evidence of one or more of the following: (1) that the defendant actually and directly participated in the alleged unconstitutional acts; (2) that the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) that the defendant created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) that the defendant was grossly negligent in supervising the correctional officers who committed the constitutional violation; or (5) that the defendant failed to take action in response to information regarding the occurrence of unconstitutional conduct.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[5]

Defendants argued in their memorandum that Warden Quiros had no personal involvement.  *See* Defs.' Mem. at 27-33.  Mr. Alston did not address that argument in his opposition memorandum.  Apart from his affidavit testimony that he submitted a complaint to Warden Quiros, Mr. Alston points the Court to no other evidence of any conduct on the part of Warden Quiros, and the Court's independent review of the record uncovered none.  Mr. Alston has not made any arguments that Warden Quiros was personally involved based on the *Colon* factors, he does not point the Court to any evidence suggesting that any of those factors would apply, and the Court's independent review of the record uncovered no evidence suggesting that

---

[5] In *Ashcroft v. Iqbal*, the Supreme Court noted that a supervisor can be held liable only "through the official's own individual actions." 556 U.S. 662, 676 (2009).  This decision arguably casts doubt on the continued viability of some of the categories for supervisory liability. The Second Circuit, however, has not revisited the criteria for supervisory liability following *Iqbal*.  *See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test . . . after *Iqbal*."); *Grullon*, 720 F.3d at 139 (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but finding it unnecessary to reach the impact of *Iqbal* on the personal involvement requirements set forth in *Colon*).  Because it is unclear whether *Iqbal* overruled or limited *Colon*, the Court will continue to apply the categories for supervisory liability set forth by the Second Circuit.

any of those factors would apply.  As a result, Mr. Alston has failed to raise a genuine dispute as to Warden Quiros's personal involvement in the alleged constitutional deprivation, and the retaliation claim against Warden Quiros must be dismissed.

The Court concludes that Mr. Alston has raised a genuine dispute as to Lt. Pafumi's personal involvement, because a reasonable jury could conclude that Lt. Pafumi directly participated in the alleged unconstitutional acts.  *Colon*, 58 F.3d at 873.

### 5.      Causal Connection

The causal connection between protected speech and an adverse action must be sufficient to warrant the inference that the protected speech was a "substantial motivating factor" in the adverse action.  *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006).  Even if the plaintiff makes that showing, the defendant can still prevail on a motion for summary judgment if he can show that he would have taken the same adverse action "even in the absence of the protected conduct."  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage."  *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (internal quotation marks and citations omitted).

### a.      Initial Placement on In-Cell Restraint Status

Mr. Alston has raised a genuine dispute as to whether his protected activity was a substantial motivating factor in the initial decision to place him on in-cell restraint status.  Mr. Alston's protected activity and the adverse action are temporally proximate – he was placed on in-cell restraint status approximately one month after his complaint about Lt. Pafumi's alleged

verbal abuse, and approximately two weeks after his complaint about Lt. Pafumi allegedly

abusing the disciplinary process.  Moreover, Mr. Alston has sworn that Lt. Pafumi made several

comments within weeks of his placement on in-cell restraint status from which a reasonable jury

could infer retaliatory animus.  During the alleged encounter regarding Mr. Alston's property

boxes, Lt. Pafumi allegedly yelled that Mr. Alston was never satisfied and always found

something to complain about.  Following Mr. Alston's complaint about that alleged encounter,

Lt. Pafumi allegedly told Mr. Alston that he and other officers were "going to make [his] life a

living hell."  Following Mr. Alston's complaint about alleged misuse of the disciplinary process,

Lt. Pafumi allegedly told Mr. Alston, "[W]e have something real special for you Mr. Alston."

The next event chronologically of which there is record evidence is Lt. Pafumi placing Mr.

Alston on in-cell restraint status.  *See Alston*, 2015 WL 4487973, at *8 (noting that, with respect

to causal connection, "a court may consider a number of factors, including any statements made

by the defendant concerning his motivation and the temporal proximity between the protected

activity and the defendant's adverse action" and denying motion to dismiss retaliation claim

where Mr. Alston alleged that one prison official said, "you complain about everything, one day

I am going to really [expletive] you up!" and Lt. Pafumi allegedly suggested placing Mr. Alston

on in-cell restraint status "since the plaintiff like[s] to sue us" before placing Mr. Alston on

in-cell restraint status) (internal quotation marks and citations omitted).  Drawing all reasonable

inferences in Mr. Alston's favor, and construing the evidence in the light most favorable to him,

the Court concludes that he has raised a genuine dispute that his protected activity was a

substantial motivating factor in the initial decision to place him on in-cell restraint status.

The burden now shifts to Defendants to establish that they would have placed Mr. Alston

on in-cell restraint status even in the absence of any protected activity or retaliatory motive.  *See*

*Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003). Defendants argue that is the case because, by covering his cell door window, Mr. Alston engaged in acutely disruptive behavior that violated DOC rules and interrupted normal prison operations.

DOC rules provide that in-cell restraints may be applied to an inmate to maintain order, safety, and security. Admin. Directive 6.5 at ¶¶ 8.A.5, 8.B.1. "Interfering with Safety or Security," the offense for which Mr. Alston received a Disciplinary Report in connection with the events of November 23, 2009, is a Class A Offense under DOC rules and is defined as "[i]nterfering with, resisting or obstructing the execution of a staff member's official duties." Admin. Directive ¶ 9.5 at ¶ 12.P. The evidence shows that covering a cell door window implicates safety and security concerns, as it prevents DOC staff from being able to tell if inmates are harming themselves or engaging in destructive or prohibited behavior. Thus, placement on in-cell restraint status may be an appropriate measure to maintain order, safety, and security when an inmate covers his or her cell door window. Moreover, Lt. Pafumi attested, and the video evidence shows, that Mr. Alston's covering his cell door window, and his subsequent refusal to comply with orders to "cuff up," occupied the attention of several staff members, including COs, a mental health worker, and a nurse. Thus, placement on in-cell restraint status may be an appropriate measure to maintain order when an inmate's covering his or her cell window interrupts normal prison operations.

However, it is insufficient for defendants to establish merely that they could have placed Mr. Alston on in-cell restraint status for covering his cell door window. They must establish that they would have done so. *See Johnson v. Shovah*, 152 F.3d 918, at *3 (2d Cir. 1998) (vacating summary judgment as to retaliation claim because "[t]he defendants [*sic*] assertion that the same punishment *could* have been imposed . . . is insufficient. The defendants have produced no

evidence (such as, for example, an affidavit from Lt. Shovah suggesting that he usually imposes the maximum sentence on inmates in possession of large volumes of contraband, or prison disciplinary statistics regarding average punishments for contraband violations) to suggest that that outcome *would* have occurred.") (emphasis in original).

Defendants submitted evidence of three prior instances in which Mr. Alston covered his cell door window.  He was placed on in-cell restraint status on only one of those three occasions. *See* Defs.' Exs. 9-11.   In addition, Mr. Alston submitted evidence of nine other inmates who covered their cell door windows in the month of November 2009 and were not placed on in-cell restraint status.  *See* Pl.'s 56(a)2 Stmt. at 23-24.  Finally, while Lt. Pafumi did attest that covering a cell door window will result in the issuance of a disciplinary report, he did not attest, or provide data showing, that inmates always or usually are placed on in-cell restraint status for covering their cell door windows.  *See Shovah*, 152 F.3d at *3 (suggesting that statistics or affidavit from lieutenant suggesting that he usually imposes the maximum sentence on inmates in possession of large volumes of contraband could have provided grounds for summary judgment).  While Defendants have shown that they could have placed Mr. Alston on in-cell restraint status for covering his cell door window, the record does not establish beyond genuine dispute that they would have.  Accordingly, summary judgment is denied as to Mr. Alston's retaliation claim based on his initial placement on in-cell restraint status.  *See id.*

### b.   Continuation of In-Cell Restraint Status

Mr. Alston has raised a genuine dispute as to the causal connection between his protected activity and Lt. Pafumi's decisions on November 24 and 25 to keep Mr. Alston on in-cell restraint status.

First, as discussed *supra*, the temporal proximity between Mr. Alston's protected activity and these adverse actions, along with Lt. Pafumi's alleged remarks, raise a genuine dispute as to whether Mr. Alston's protected activity was a substantial motivating factor in Lt. Pafumi's decisions to keep him on in-cell restraint status.

Second, Defendants contend that they would have kept Mr. Alston on in-cell restraint status on November 24 and 25 even in the absence of his protected activity or a retaliatory motive because Mr. Alston was engaging in disruptive behavior while on in-cell restraint status. Defendants point to the restraint checklist, which documents staff observations of Mr. Alston's behavior every 15 minutes. The restraint checklist documents long stretches of disorderly and disruptive behavior that could supply a legitimate basis for keeping Mr. Alston on in-cell restraint status, including beating on the door and walls, yelling, cursing, and even standing on the sink. *See generally* Defs.' Ex. 17.

However, Mr. Alston contends that the restraint checklist was falsified. He swears in his affidavit that his behavior while on in-cell restraint status was not disruptive, and that the checklist does not accurately reflect his behavior. Furthermore, two neighboring inmates submitted affidavits in which they swear under oath that they did not hear or observe Mr. Alston being disruptive from November 23 to 26, and one attests that he reviewed the checklist and disagrees with its contents. *See* Pl.'s Exs. 4-5.

While disorderly and disruptive behavior could serve as a legitimate basis for keeping an inmate on in-cell restraint status, the Court concludes that Mr. Alston has raised a genuine dispute as to whether he engaged in such behavior while on in-cell restraint status. Again, if there were video evidence clearly showing Mr. Alston engaged in disorderly and disruptive behavior while on in-cell restraint status, the Court could grant summary judgment in Lt.

Pafumi's favor.  *See Scott*, 550 U.S. at 380.  Instead, there is an absence of such evidence.  A

jury is free to discredit Mr. Alston's allegations that multiple DOC employees falsified the

checklist and fabricated behavior as unique and particular as standing on a sink.  But the Court

has the sworn testimony of Mr. Alston and other prisoners, against the word of DOC staff as

reflected in the checklist, and cannot weigh this competing evidence.  Therefore, the Court must

deny summary judgment as to Mr. Alston's claim that Lt. Pafumi retaliated against him by

keeping him on in-cell restraint status.  *See In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009)

("[T]he court must *draw all reasonable inferences in favor of the nonmoving party,* and *it may

not make credibility determinations or weigh the evidence*") (emphasis in original).

### 6.      Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  State actors are entitled to

judgment in their favor on constitutional claims if they did not violate clearly established rights

about which a reasonable official would have known.  *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir.

2006).  A right is clearly established if, "at the time of the challenged conduct, the contours of

[the] right are sufficiently clear that every reasonable official would have understood that what

he [was] doing violates that right.'"  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal

quotation marks and citation omitted).

Defendants have not shown that there is no genuine dispute of material fact that Lt.

Saylor and Lt. Pafumi did not violate clearly established rights about which a reasonable official

would have known.  As to Lt. Saylor, there is a genuine dispute as to whether he assaulted Mr.

Alston, but there can be no dispute that such an assault would violate the clearly established right

of an inmate to be free from malicious and sadistic uses of force.  *See Hudson*, 503 U.S. at 9.

Likewise, as to Lt. Pafumi, an inmate's First Amendment right to be free from retaliation for

engaging in protected activity was clearly established at the time of the events at hand, *see, e.g.*, *Davis*, 320 F.3d at 352, there is a genuine dispute as to whether Lt. Pafumi retaliated against Mr. Alston for filing complaints, and Mr. Alston, by attesting to alleged statements by Lt. Pafumi from which a reasonable jury may infer retaliatory animus, has "proffer[ed] particularized evidence of direct or circumstantial facts . . . supporting the claim of an improper motive[,]" *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995) ("[E]vidence of improper motive may include expressions by the officials involved regarding their state of mind").  Accordingly, summary judgment will not enter in Defendants' favor on the basis of their qualified immunity defense.

### D.      Unconstitutional Conditions of Confinement

Mr. Alston claims that he was subjected to unconstitutional conditions of confinement while on in-cell restraint status.  Specifically, he claims that he was "short-chained" (*i.e.*, the tether chain attaching his leg irons to his handcuffs was too short and forced him to hunch over), he could not use the toilet while wearing in-cell restraints, his cell smelled like feces, the toilet in his cell was filled with feces, and he could not flush the toilet because the flushing mechanism was controlled by COs outside of his cell.

First, Mr. Alston's claim that he was short-chained lacks a factual basis.  The video evidence clearly shows that, after the in-cell restraints were applied, Mr. Alston was able to stand fully erect, as required by DOC rules.  Moreover, the video shows that staff were able to place multiple fingers between Mr. Alston's skin and his restraints.

Second, the record evidence belies Mr. Alston's claims regarding the sanitation of his cell.  Mr. Alston was provided clean clothes when he was placed on in-cell restraints.  The video evidence shows that Mr. Alston's clothing was clean when he was removed from in-cell restraint status.  The video evidence also shows that the cell was clean when Mr. Alston entered and when

he left. In light of the video evidence, no reasonable jury could conclude that Mr. Alston's conditions of confinement were unconstitutional.

Finally, even if the Court were to credit all of Mr. Alston's claims as to the conditions of his cell, there is no record evidence that he suffered an objectively serious injury rising to the level of a constitutional deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.") (internal quotation marks and citations omitted); *Alston*, 2015 WL 4487973, at *10 (dismissing Mr. Alston's conditions of confinement claim where he alleged that "(1) the cell where he was placed on in-cell restraint status was unsanitary and odorous, (2) the toilet to that cell could only be flushed by pushing a button on the outside of the cell, (3) the window was dirty, and (4) the lights of the cell remained on 24 hours a day" because he did not satisfy the objective and subjective components of the test: he "[did] not allege that he sustained an injury from those conditions, let alone an objectively serious one" and he "[did] not allege that [he] was exposed to some substantial risk of harm and therefore [did] not allege that Defendants were aware of that risk."); *Alston v. Butkiewicus,* No. 3:09-cv-00207 (CSH), 2012 WL 6093887, at *9–10 (D. Conn. Dec. 7, 2012) (granting summary judgment as to Mr. Alston's conditions of confinement claim premised on allegations that, while on in-cell restraints on four separate occasions (a 72-hour period, a 15-hour period, a 53-hour period, and an 8-hour period) for covering his cell door window and/or blocking the trap on his cell door, he was "short-chained," he was unable to use the toilet, and his cell had urine, feces, and blood smeared about, because video recordings showed that Mr. Alston could stand fully erect, and his clothes and cell were clean).

**V.      CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 191) is

GRANTED IN PART AND DENIED IN PART.  Judgment shall enter in Defendants' favor as

to all claims except the following: (1) excessive force in violation of the Eighth Amendment

against Lt. Saylor; (2) retaliation in violation of the First Amendment against Lt. Pafumi.  All

defendants other than Lt. Saylor and Lt. Pafumi are dismissed from this lawsuit.


SO ORDERED at Bridgeport, Connecticut this seventh day of January, 2016.


 /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE